RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

JAMES MICHAEL HOLDEN (07-5573) and
JAMES LARRY HOLDEN (07-5574),

        *Defendants-Appellants.*

Nos. 07-5573/5574

_____

Appeal from the United States District Court
for the Middle District of Tennessee at Columbia.
No. 05-00011—William J. Haynes, Jr., District Judge.

Argued: January 22, 2009

Decided and Filed: February 24, 2009

Before: MARTIN and MOORE, Circuit Judges; GWIN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jude T. Lenahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, Dan R. Alexander, LAW OFFICE, Nashville, Tennessee, for Appellants. Heather G. Childs, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Jude T. Lenahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, Dan R. Alexander, LAW OFFICE, Nashville, Tennessee, for Appellants. Heather G. Childs, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Circuit Judge.   This appeal involves convictions arising out of an investigation into false reporting of pollutant levels in wastewater discharged by a water treatment facility in Mount Pleasant, Tennessee.  Mike Holden, the operator of the plant, was convicted of knowingly falsifying and concealing material facts in a matter within the jurisdiction of the Environmental Protection Agency ("EPA") in violation of 18 U.S.C. §§ 2, 1001(a), and of falsifying documents with the intent to impede an investigation within the jurisdiction of the EPA in violation of 18 U.S.C. §§ 2, 1519.  His father, Larry Holden, the Superintendent of Public Works for Mount Pleasant, was convicted of knowingly falsifying and concealing material facts in a matter within the jurisdiction of the EPA.

The Holdens challenge their convictions on four grounds.  First, they argue that the district court abused its discretion by excluding evidence that Marty Roddy had been treated for marijuana dependency in 1992.  Second, they argue that the district court committed plain error by admitting into evidence a negative evaluation of the plant from before the charged period.  Third, they argue that the district court abused its discretion by refusing to admit statements by Mike Holden under the "rule of completeness." Fourth, they argue that the evidence presented at trial was insufficient to find James Larry Holden guilty beyond a reasonable doubt.

We find that no reversible error occurred at trial, and we thus AFFIRM.

I.

The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, makes it illegal to discharge a pollutant into the navigable waters of the United States except as authorized by the EPA or the Army Corps of Engineers.  33 U.S.C. §§ 1311(a), 1362(6), 1362(7), 1362(12)(A).  As part of its National Pollutant Discharge Elimination System, 33 U.S.C. § 1342, the EPA has authorized the Tennessee Department of Environment and Conservation

("TDEC") to issue discharge permits under the Act.  TDEC issued a permit to the wastewater treatment facility in Mount Pleasant, Tennessee, that allowed the plant  to discharge treated wastewater into Sugar Fork Creek if the plant complied with certain conditions.  This permit imposed strict daily limits on the amount of pollutants that the facility could discharge, and required the plant to regularly test the pollutant levels of its outflow, keep detailed records of its test results, and make monthly compliance reports to TDEC.

Mike Holden was the longtime operator of the Mount Pleasant facility, and was certified as a Grade IV wastewater treatment operator, the highest certification level.  As operator of the facility, Mike Holden was responsible for testing pollutant levels, keeping records, reporting to TDEC, and certifying the accuracy of these reports.  Marty Roddy assisted Mike Holden in running the facility.  Roddy was not certified as a wastewater treatment operator, but Mike Holden informally trained him how to collect the data and samples necessary to meet the reporting requirements of the permit program, and eventually put him in charge of sample collection and testing.  Mike Holden used the results Roddy gave him to make compliance reports to TDEC, and he certified the reports to be true.  During all relevant times, Larry Holden was the Superintendent of Public Works of Mount Pleasant.  The plant fell under his administrative supervision, and he visited the plant on a regular basis to monitor its operation.

The Mount Pleasant facility had a history of compliance problems, and eventually the test results reported by the plant aroused suspicion with TDEC.  The reported pollutant levels of the plant's outflow did not vary with its inflow (as one might expect); neither did the amount of chlorine the plant used in treating its wastewater.  This prompted TDEC and the EPA to perform a joint audit of the plant in August 2003.  Inspectors found the plant's testing lab in disrepair, littered with broken equipment, and showing little evidence of use.  Further, the lab's testing records were incomplete from January 2001 through June 2003, and they lacked the data necessary to perform required tests and generate the results submitted in the monthly reports.  In an effort to determine

whether the plant was violating the terms of its permit, TDEC began independent spot-testing of the fecal coliform[1] levels of water discharged by the plant. These tests revealed massive disparities between the plant's reports and the actual levels of fecal coliform in the plant's outflow. In four spot tests conducted in late 2003, the plant reported levels of fecal coliform of 23, 27, 28, and 27 units per 100 milliliters of water; however, TDEC tests revealed the actual levels of fecal coliform in the plant's outflow to be 20,000, 600,000, 1,700, and 6,000 units each. The plant's permit allowed a discharge of no more than 1000 units per day.

Based upon these findings, the Tennessee Bureau of Investigation obtained a search warrant and searched the plant on April 8, 2004. This search revealed that the testing records previously found to be blank had been filled in. During this search, the Holdens arrived at the plant. Larry Holden confronted investigators and told them he would be taking the matter to the governor. Mike Holden told investigators that Marty Roddy was responsible for testing and that he had no knowledge of any wrongdoing. He admitted that he knew he was not adequately supervising Roddy, that the numbers being reported were "crazy," that he could not explain why the records were blank, and that "if it were up to him, he would report the correct numbers." Later, Marty Roddy told investigators that he had filled in the records at the instruction of Mike and Larry Holden shortly after the audit. At this time, the plant was processing between 3 and 4 million gallons of waste water a day—far in excess of its capacity of 1.2 million gallons. As a result, large amounts of untreated wastewater were being released into Sugar Fork Creek.

On July 17, 2005, Mike Holden and Marty Roddy were indicted for falsely reporting test results in violation of 18 U.S.C. 1001(a). A superceding indictment was issued on September 7, 2005. It added Larry Holden as a defendant and an additional charge, falsifying documents with the intent to impede an EPA investigation in violation of 18 U.S.C. §§ 2 and 1519. Marty Roddy pleaded guilty to count one and cooperated with the government. He was sentenced to six months home detention.

---

[1]Fecal coliform is a kind of bacteria that is highly concentrated in untreated wastewater.

Mike Holden and Larry Holden went to trial.  Mike Holden testified that he did not know that Roddy was not collecting data or testing pollutant levels, and that he blindly signed off on the results Roddy gave him.   Larry Holden admitted that he knew the plant was operating at above capacity, but denied any involvement in the filing of reports.  Roddy testified that from 2001 to 2004, the plant failed to test discharged water for pollutants about 80% of the time, and that when testing was done, Mike Holden provided him with water collected from a different creek nearby, or instructed him to adjust the numbers on the monthly reports to fall within permitted levels.  Based on this testimony, the United States argued that either the Holdens had actual knowledge of the false reporting or that they had been deliberately indifferent to it.

On September 25, 2006, Mike Holden was convicted of both false reporting and falsifying documents; Larry Holden was convicted only of false reporting.  Mike Holden was sentenced to 32 months in prison, and Larry Holden was sentenced to 24 months.  They now appeal their convictions.

II.

1.   *The Admissibility of Evidence of Marty Roddy's Treatment for Marijuana Dependency*

At trial, the Holdens sought to impeach Marty Roddy with evidence that he had been treated for marijuana dependency in 1992.  Roddy's treatment record indicated both that his heavy marijuana use had caused him short-term memory loss and that he had not been truthful about the extent of his use.  The Holdens argued that this evidence should be admitted to impeach Roddy's character for truthfulness and his memory.  The district court  ruled that the defense could only introduce evidence of drug use as it related to Roddy's ability to perceive the events that were the subject of his testimony and testify about them at trial.  It thus excluded evidence of Roddy's treatment because it occurred nine years prior to the charged conduct.  In doing so, the court explained that the treatment was "too remote in time" to be probative and "lack[ed] a causal relationship" with Roddy's testimony at trial.

The Holdens contend that the district court abused its discretion by refusing to allow Roddy's prior treatment into evidence under Fed. R. Evid. 608(b) or Fed. R. Evid. 612, and that in doing so it violated the Confrontation Clause of the Sixth Amendment. We review a district court's evidentiary decisions for abuse of discretion. *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005). It is an abuse of discretion for a district court to commit legal error or find clearly erroneous facts. *Id.*

### A.    Rule 608(b)

FRE 608(b)(1) provides that a witness's credibility may be attacked on cross-examination through questioning on specific instances of conduct relevant to credibility. As a general matter, prior drug use is not relevant to a witness's character for truthfulness. *United States v. March*, 114 F. App'x 671, 674 (6th Cir. 2004) ("A witness's use of drugs may not be used to attack his or her general credibility, but only his or her ability to perceive the underlying events and testify lucidly at trial.") (quoting *Jarrett v. United States*, 822 F.2d 1438, 1446 (7th Cir. 1987)); *United States v. Sellers*, 906 F.2d 597, 602 (11th Cir. 1990). Consistent with this, the district court held that the defense could ask questions about Roddy's ability to perceive the events that were the subject of his testimony—the  nature of testing performed at the plant from 2001 to 2004. This was not an abuse of discretion. The evidence of drug treatment in 1992 was offered only to impeach Roddy's general credibility, and it occurred nine years prior to the start of the charged period. That Roddy may have misrepresented his drug use or experienced memory loss at that time has little if any relevance to his ability to testify truthfully about an unrelated subject more than a decade later. Contrary to the Holdens' suggestion, this evidence does not establish either a pattern of dishonesty or permanently impaired memory. Rather it is isolated evidence that is remote in time and laden with potential unfair prejudice. Thus, it was reasonable for the district court to exclude it.

### B.    Rule 612

Federal Rule of Evidence 612 allows a witness to refresh his recollection as to the contents of a document if he is unable to recall them while on the stand.  Larry Holden argues that Roddy's record of treatment should have been admitted under this provision.  This is incorrect.  Rule 612 is not an independent source of admissibility, but rather a means to refresh a witness's memory on an admissible subject of testimony: "Rule 612 does not apply where a witness refers to documents for purposes other than refreshing recollection.  In such a case, Rule 612 is inapplicable and the question becomes whether the writing is admissible under laws regulating the admissibility of documentary evidence." 28 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 6183.  Here, the district court ruled that the document was not relevant to Roddy's testimony about the running of the plant between 2001 and 2004, so questions about it could not be asked in the first place and Larry Holden could not attempt to refresh Roddy's memory of the subject while on the stand.

### C.    Confrontation Clause

The Confrontation Clause of the Sixth Amendment guarantees a defendant an opportunity  to impeach the credibility of a witness against him because impeachment is fundamental to effective cross-examination.  *Davis v. Alaska*, 415 U.S. 308, 315-18 (1974).  As the Supreme Court explained in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), however, this does not mean that the defendant is free to impeach a witness "in whatever way, [or] to whatever extent the defense might wish." *Id.* at 679; *see also Boggs v. Collins*, 226 F.3d 728, 736-37 (6th Cir. 2000).  Rather, trial judges retain "wide latitude" to impose "reasonable limits on cross-examination." *Van Ardsdall*, 475 U.S. at 679.  The key issue is whether the jury had enough information to assess the defense's theory of the case  despite the limits placed on cross-examination. *Boggs*, 226 F.3d at 739.

Here, the proposed impeachment related to Roddy's prior treatment for marijuana dependency.  The court permitted the defense to impeach Roddy extensively, including through the introduction of evidence that Roddy used drugs during the time period that

was the subject of his testimony at trial. The district court's refusal to allow evidence of drug treatment nearly a decade beforehand for general impeachment purposes was reasonable in light of the evidence's marginal evidentiary value and danger of unfair prejudice. This narrow limitation did not restrict the jury's ability to assess the defense's theory of the case to a degree sufficient to raise Confrontation Clause concerns.

   2.   *Admission of Evidence Regarding the 1995 Evaluation of the Plant*

The district court allowed testimony by Karen Harrison, a civil engineer, on a number of subjects, including an evaluation of the plant she conducted in 1995. Mike Holden operated the plant during this time. In evaluating the plant, Harrison discovered incomplete and implausible data very similar to that found by investigators in 2003, which led to the charges against the Holdens. Harrison sent a letter documenting these irregularities to city officials, including Larry Holden. Here, Mike Holden argues that this was propensity evidence that should have been excluded under Federal Rule of Evidence 404(b). Because this issue was not preserved for appeal, we review for plain error. *Johnson v. United States*, 520 U.S. 461, 467 (1997).

Rule 404(b) prohibits the use of extrinsic evidence of a person's "other crimes, wrongs, or acts" to show that a person acted in conformity with them. Intrinsic evidence does not fall within the rule, and evidence offered for a non-propensity purpose is admissible under it. *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995). Here, the evidence at issue is admissible under Rule 404(b). The Holdens' defense theory was that Marty Roddy fabricated test results without their knowledge. However, Marty Roddy did not have a substantial role in testing in 1995. Thus, the fact that the plant was suffering the same sort of reporting inaccuracies in 1995 and that those in charge of the plant were informed of this tends to rebut the Holdens' claims and corroborate Roddy's version of events. This is not evidence that encourages the jury to infer future misconduct based upon past misconduct, but circumstantial evidence that one account *of the charged conduct* is more credible than another. Thus, this evidence is not barred by Rule 404(b). And, contrary to Mike Holden's suggestion, this evidence was not "unfairly prejudicial." Evidence that undermines one's defense by virtue of its

"legitimate probative force" does not *unfairly* prejudice the defendant. *United States v. Schrock*, 855 F.2d 327, 335 (6th Cir. 1988).

Because this evidence was admissible under Rule 404(b), the district court did not commit plain error in admitting it.[2]

### 3.   The Rule of Completeness

The district court held that certain admissions Mike Holden made to Agent Stegall were admissible under Federal Rule of Evidence 801(d)(2), but sustained the government's hearsay objections to other statements from the same conversation when Holden sought to bring them out during cross-examination. Holden argues that the judge erred in holding that the defense waived its ability to invoke the "rule of completeness," and that these statements should have been admitted under that rule. A district court's evidentiary decisions are reviewed for abuse of discretion. *McDaniel*, 398 F.3d at 544. It is an abuse of discretion for a district court to commit legal error or find clearly erroneous facts. *Id.*

The "rule of completeness" allows a party to correct a misleading impression created by the introduction of part of a writing or conversation by introducing additional parts of it necessary to put the admitted portions in proper context. The common law version of the rule was codified for written statements in Fed. R. Evid. 106,[3] and has since been extended to oral statements through interpretation of Fed. R. Evid. 611(a).[4] Courts treat the two as equivalent. *United States v. Shaver*, 89 F. App'x 529, 532 (6th Cir. 2004). Because admitting the curative evidence later in the trial may not be

---

[2]The record does not disclose whether the district court admitted the evidence under Rule 404(b) or as intrinsic evidence to which the rule does not apply. However, if the district court's Rule 404(b) analysis was inadequate, any such error did not affect Holden's substantial rights or the fairness of his trial because the evidence at issue was admissible under Rule 404(b).

[3]"When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Fed. R. Evid. 106.

[4]"The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a).

adequate to remedy the effect of the misleading impression, Rule 106 authorizes a party to interrupt the proceedings to have the curative evidence introduced immediately. However, "[t]he rule does not in any way circumscribe the right of the adversary to develop the matter on cross-examination or as part of his own case." Fed. R. Evid. 106 advisory committee's note.

Here, the judge held that Mike Holden waived his rights under the rule of completeness by failing to invoke the rule when the purportedly misleading evidence was introduced. Whether a party waives their right of completeness under these circumstances is an open question in this circuit, but we now reject the waiver rule adopted by the district court. As the advisory committee's note to Rule 106 makes clear, the rule does not restrict admission of completeness evidence to the time the misleading evidence is introduced: "The rule does not in any way circumscribe the right of the adversary to develop the matter on cross-examination or as part of his own case." Congress's decision to put the timing of the completeness evidence in the hands of the party offering it weighs against imposing an additional requirement that parties invoke the rule at the time evidence is introduced. Further, the purpose of the rule of completeness is to ensure fairness in the presentation of evidence at trial; in delaying completion or denying it altogether a strict waiver rule frustrates this purpose without serving any corresponding value. If a party fails to invoke the rule at the time the misleading evidence is introduced, the chance to do so is lost independent of the effect of a waiver rule, and allowing parties to invoke the rule of completeness after the misleading evidence is introduced does not limit the district judge's discretion to determine whether and when the curative evidence should be admitted. *See* 21A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 5076 ("[T]o put it in the language of the Rule, when the invocation comes late, the question is whether 'fairness' requires completion prior to the opponent's next opportunity to complete as part of her own case."). Thus, we hold that the district court erred by ruling that Mike Holden waived his rights under the rule of completeness by waiting to introduce the evidence. *See Phoenix Assoc. II v. Stone*, 60 F.3d 95, 103 (2d Cir. 1995); *see also* 21A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 5076 (endorsing *Phoenix Assoc. II*, stating

that "the better-reasoned cases hold that the opponent need not invoke Rule 106 at the time the truncated evidence is introduced").

That raises the question of whether this error was harmless. Because the statements Holden seeks to introduce are inadmissible hearsay, we hold that it was. The inculpatory statements against Holden were admissible under Fed. R. Evid. 801(d)(2), the hearsay exclusion for admissions of a party opponent. However, Mike Holden was unable to avail himself of this exception because he sought to introduce his own statement. Thus, his statements are inadmissible hearsay and were properly excluded. *See* Fed. R. Evid. 801(d)(2); *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982) ("Rule 106 is intended to eliminate the misleading impression created by taking a statement out of context . . . it is not designed to make something admissible that should be excluded.").[5]

Finally, contrary to Mike Holden's suggestion, this ruling did not compel him to take the stand. The mere fact that evidence admitted under Rule 801(d)(2) motivates a defendant to take the stand does not mean that he was *compelled* to do so in a manner that implicates his privilege against self-incrimination. *Shaver*, 89 F. App'x at 533; *United States v. Turner*, 995 F.2d 1357, 1363 (6th Cir. 1993) ("Turner was not compelled to testify nor was he forced to explain those statements. Rather, he could have refused to testify and permitted the jury to decide if the firemen's accounts of his previous statements were credible.").

---

[5]Even if the rule was that hearsay evidence could come in under the rule of completeness, Mike Holden's statements here were not necessary to correct a misleading impression created by his admissions to Agent Stegall because they are equivocal as to whether he was aware of any false reporting prior to the search. Contrary to Holden's assertion, his statements are consistent with the theory that Roddy, not he, was in charge of the numbers. And in any case, Mike Holden was able to adequately develop his lack of knowledge defense during his case in chief.

### 4.    *Sufficiency of the Evidence Against Larry Holden*

Finally, Larry Holden argues that the evidence presented at trial was insufficient to support a verdict against him.  The standard of review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime.  *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996).  There are five elements of the crime of falsifying and concealing facts in a matter within the jurisdiction of the EPA: (1) the defendant made a factual representation; (2) the representation is false or fraudulent; (3) the representation is material; (4) the defendant made the representation knowingly and willfully; and (5) the representation pertained to an activity within the jurisdiction of a federal agency.  *United States v. Steele*, 933 F.2d 1313, 1318-19 (6th Cir. 1991) (en banc).

The representations at issue here were the monthly reports to TDEC pursuant to their obligations under the Clean Water Act, an activity within the jurisdiction of the EPA.  The disparities between the TDEC fecal coliform tests and the amounts reported, as well as statements by various witnesses support an inference that these representations were false or fraudulent.  And, because the tested amounts were greater than allowed by the permit but the reported amounts were not, these representations were material.  The reporting requirements are a primary means of enforcing the Clean Water Act, and false reporting frustrates this purpose.

The evidence presented was also sufficient for a rational factfinder to find that Larry Holden willfully made these representations.  He supervised the activities at the plant and there is evidence that he was not only on notice to reporting irregularities, but that he was actively involved in the false reporting.  Marty Roddy testified that Larry Holden had told him to "make the numbers look good," and had instructed him to fill in the empty bench sheets used to make the reports.  He also testified that Larry Holden threatened him and told him not to tell authorities about what he had done. Former employee Paul Gutherie testified that he had heard Larry and Mike Holden discussing "bogus numbers," and that on a number of occasions he had heard Roddy tell Mike

Holden, "I'm not going to, you know, go to jail for you or your daddy. If you want to go to jail for your daddy you can." Larry Holden also informed investigators that he was aware the plant was operating at well above capacity and that this was causing untreated sewage to flow into the creek.

### III.

For the foregoing reasons, we AFFIRM the convictions of Mike and Larry Holden.